IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Gregory W. Keefer, | ) | C/A No.: 1:14-236-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain dated November 21, 2014, referring this matter for disposition. [ECF No. 21]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals ("Fourth Circuit").

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

    A.    Procedural History

On February 22, 2010, Plaintiff filed an application for DIB in which he alleged his disability began on August 10, 2009. Tr. at 117–18. His application was denied initially and upon reconsideration. Tr. at 57–60, 65–66. On March 10, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thomas G. Henderson. Tr. at 25–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 21, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–20. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on October 4, 2011. Tr. at 435–36. On March 13, 2013, the undersigned issued an order reversing the Commissioner's decision and remanding the matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g). Tr. at 439–65. On April 24, 2013, the Appeals Council issued an order remanding the case to an ALJ. Tr. at 466–69. On September 26, 2013, Plaintiff had a second hearing before ALJ Henderson. Tr. at 406–14 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 7, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 396–405. The ALJ's decision provided Plaintiff with the option to either file exceptions with the Appeals Council within 30 days or to file an action in this court within 60 days of the

date on which the ALJ's decision became final.[1] Tr. at 396–97. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 27, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 53 years old on his date last insured ("DLI"), 54 years old at the time of the first hearing, and 57 years old at the time of the second hearing. Tr. at 117. He completed the eighth grade. Tr. at 135. His past relevant work ("PRW") was as a boiler operator and truck driver. Tr. at 191. He alleges he has been unable to work since August 10, 2009. Tr. at 117.

2.    Medical History

a.    Records Prior to Plaintiff's DLI

On January 16, 2008, Plaintiff complained of fatigue to a physician at Doctors Care, where an assessment included fatigue and joint pain. Tr. at 301. Lab results dated January 21, 2008, indicated hypothyroidism, and Plaintiff was started on Levothyroxine. Tr. at 292. Notes from follow-up appointments on January 21, 2008, and on February 18, 2008, included diagnoses of hypothyroidism, hyperlipidemia, and depression/anxiety. Tr. at 288, 291. In May 2008, Plaintiff's prescriptions included Levothyroxine for hypothyroidism, Celexa for depression, and Pravastatin for elevated cholesterol. Tr. at 286.

_____

[1] The ALJ's decision explained that it would become the final decision of the Commissioner on the sixty-first day after the date it was issued.

On May 3, 2009, Plaintiff presented to the Roper Hospital Emergency Department with complaints of lower abdominal pain and difficulty urinating. Tr. at 194. He reported a history of kidney stones, prostatic stones, anxiety, and hemorrhoids. *Id.* Discharge diagnoses included chest pain of unknown cause and epididymitis (inflammation of the organ just behind the testicle; often caused by heavy lifting/exercise). Tr. at 206. He was advised to undergo cardiac stress testing and to have an ultrasound. Tr. at 206–07.

Plaintiff followed up with Dr. Francis Tunney at Patient One on May 5, 2009. Tr. at 218. He was noted to have no known medical problems, but admitted to snoring and daytime fatigue and reported a history of depression. *Id.* On examination, Plaintiff exhibited a normal gait and stance, musculoskeletal posture, balance, mood, and memory. Tr. at 220. Dr. Tunney noted that Plaintiff's scrotal pain was of unclear etiology and advised him to follow up with his primary care physician. *Id.*

b.    Records After Plaintiff's DLI

Plaintiff initiated care with Dr. David Castellone of Palmetto Primary Care on November 13, 2009. Tr. at 368. He reported pain in his hips, legs, and back, and said that his right leg was swollen. *Id.* Plaintiff stated that hypertension, anxiety, and depression began years before and that back ache and back pain began months earlier. *Id.* Dr. Castellone diagnosed new anxiety, hypertension, degenerative disc disease, and paresthesias/weakness in the legs. *Id.* He also ordered an MRI and nerve conduction studies and prescribed Celexa and Lortab. Tr. at 369. An MRI of Plaintiff's lumbar spine dated November 19, 2009, revealed mild degenerative facet arthropathy at L5–S1, but no compromise of the exiting L5 nerve root. Tr. at 222.

Dr. Ruth Hoover conducted a nerve conduction study on November 24, 2009. Tr. at 365. She noted that the results were difficult to interpret due to a lot of cramping during the test. *Id.* She noted signs of acute (rather than chronic) nerve root irritation at S1 bilaterally. *Id.* Dr. Hoover opined that Plaintiff's description of his pain was a bit confusing in that it seemed variable. *Id.* She stated that the MRI was not impressive, but that she was "impressed by the clinical picture and the appearance of S1 irritation despite the MRI." *Id.* She ultimately noted that the nerve conduction studies were within normal limits, but that some of Plaintiff's muscles showed moderately increased spontaneous activity. *Id.*

Plaintiff returned to Dr. Castellone on December 1, 2009, with constipation, back pain, depression, and anxiety. Tr. at 359. Plaintiff described his back pain, depression, and anxiety as severe. *Id.* He indicated that his back pain began months before. *Id.* Dr. Castellone diagnosed Plaintiff with worsening degenerative disc disease and worsening radiculopathy, as well as stable anxiety and hypertension. Tr. at 361. He referred Plaintiff to a pain clinic and gastroenterologist. *Id.*

Plaintiff presented to Summar C. Phillips, M.D., of Pain Care Physicians of Charleston ("Pain Care") on December 3, 2009, with lower back pain. Tr. at 225. He reported pain in his lower back that had begun years earlier. *Id.* He stated that pain radiated into his hips, buttocks, legs, and feet bilaterally and was sustained at five to six on a 10-point scale most days, but was worse in the evening and was sometimes associated with weakness, tingling, and numbness. *Id.* He stated that Lortab worked best to alleviate his pain, but that it only "takes the edge off." *Id.* Plaintiff stated that his daily

activities included working as a truck driver and general house maintenance, but said that he was unable to perform those tasks without pain. *Id.* Dr. Phillips administered an epidural steroid injection at L5–S1. Tr. at 226. Following the injection, Plaintiff reported that his pain was reduced from a six or seven to a four. *Id.*

Plaintiff underwent nuclear stress testing on December 8, 2009. Tr. at 305. He was found to have fair exercise tolerance. *Id.* The treating physician noted a mild defect, but otherwise normal results. *Id.*

Plaintiff returned to Dr. Phillips at Pain Care on December 23, 2009. Tr. at 229. He reported that his response to the prior injection was "real good" for two weeks, but that he still had weakness and that his pain gradually returned to a five. *Id.* Dr. Phillips administered another epidural steroid injection at L5–S1, which had an immediate effect of reducing the pain to a two. Tr. at 230, 231.

Plaintiff underwent an MRI on December 31, 2009. Tr. at 307. It revealed mostly mild diffuse spondylosis and the presence of a disc osteophyte complex at C6–7 that extended intraforaminally on both sides and could contact the exiting C7 (nerve roots). *Id.* The MRI also demonstrated a focal central superior and inferior extrusion, causing moderate central stenosis and mild anterior cord flattening. *Id.*

On January 6, 2010, Plaintiff reported to Dr. Phillips that the last lumbar epidural injection performed two weeks earlier had not provided any relief, and he had since been taking Lortab and Flexeril daily. Tr. at 233. The doctor noted that upon further questioning, it seemed that Plaintiff's leg pain had improved significantly, but that he had persistent pain in his lower back and buttocks. *Id.* Plaintiff reported that medications

helped as long as he sat still and stated that he had been limiting his daily activity to just resting and taking it easy due to the pain. *Id.* On examination, Plaintiff exhibited tenderness in the area of SI joint on the right, tenderness over the sacrum midline and pain upon flexion and extension of the lumbar spine, but demonstrated a full range of motion of the lumbar spine. *Id.* Dr. Phillips diagnosed low back pain, radicular symptoms of the lower limbs, neck pain, cervical radiculopathy, sacroiliitis, and facet arthropathy syndrome. *Id.* The doctor opined that Plaintiff's pain could be caused by either the facet arthropathy shown on the MRI or by SI joint arthropathy. Tr. at 234. Dr. Phillips noted that Plaintiff's leg pain (which had previously prevented him from walking) improved greatly with the two lumbar injections, but he still experienced leg pain in a bilateral S1 pattern while lying flat. *Id.* She further noted that given Plaintiff's good response to lumbar epidural injections, Plaintiff most likely had simple lumbar radiculopathy. *Id.* Dr. Phillips recommended that Plaintiff start Celebrex and undergo another injection in one week. *Id.*

Plaintiff returned to Dr. Phillips on January 13, 2010, complaining of severe pain in his neck for several days. Tr. at 235. The doctor decided to administer a cervical epidural injection, rather than a lumbar epidural injection, but did not complete the injection because Plaintiff began feeling light-headed and dizzy. *Id.* Plaintiff returned the following day, and Dr. Phillips performed a successful cervical epidural injection at C5–6. Tr. at 241.

On January 28, 2010, Plaintiff reported that the cervical epidural injection had helped with the pain and stiffness in his neck and with some with the radiating pain down

his arms. Tr. at 243. Plaintiff complained of pain located in the thoracic area between the shoulder blades and in the low back, and of weakness in his legs. *Id.* On examination, Dr. Phillips found thoracic and lumbar paraspinal tenderness and assessed Plaintiff's progress as "moderate at best." Tr. at 243–44. She noted that Plaintiff would be a great candidate for a spinal cord stimulator. Tr. at 244. She suspected that Plaintiff's upper back pain was muscular in nature and she prescribed the conservative measures of a TENS unit, ice therapy, and lidoderm patches. Tr. at 244.

Plaintiff received another lumbar epidural injection on February 16, 2010. Tr. at 245.    On March 9, 2010, Plaintiff reported relief from that injection, but stated that all the injections wore off after a while. Tr. at 249. He complained of shooting pain and muscle spasms in his hip, legs, and back. *Id.* He stated that bending or twisting aggravated his pain, but that taking hot baths and taking medication improved it. *Id.* Although still in pain, he agreed that his quality of life had improved with the injections and that he was able to perform his normal activities in less pain. *Id.*

On April 8, 2010, Plaintiff sought an opinion regarding leg weakness, discomfort, and refractory pain from John Plyler, M.D., a neurologist with Charleston Neurology Associates. Tr. at 317. He reported leg weakness and discomfort in his hips and legs, episodic arm jerking, dizziness, and numbness of his feet. *Id.* He stated that he had multiple epidural injections with only a marginal response over time. *Id.* On examination, Plaintiff had decreased but symmetric reflexes, patchy sensory spots distally, and some spasm in his neck and lumbar muscles. *Id.* Dr. Plyler's impression was chronic neck/back pain, paresthesias and dysthesia, possible myofascial fibromyalgia pain syndrome,

tinnitus, anxiety, and depression. Tr. at 317–18. The doctor recommended an electrophysiology evaluation, brain imaging, and baseline labs. Tr. at 318. The nerve study was normal. Tr. at 319–21. An MRI of the thoracic spine showed left central disk protrusion at T9–T10 that effaced the left ventral aspect of the thoracic cord; however, the thoracic cord demonstrated normal signal. Tr. at 316. An MRI of Plaintiff's brain was unremarkable. Tr. at 313, 315.

In a follow-up visit with Dr. Plyler on April 27, 2010, Plaintiff reported discomfort throughout his spine, discomfort and weakness in his legs, and his legs giving out with any physical exercise. Tr. at 313. He stated that he still noticed some tremor and shakes and was continuing to have syncopal and blackout events, which had been going on for about five years. *Id.* Dr. Plyler recommended an additional thyroid panel, a vitamin D supplement, consideration of rheumatological evaluation, sleep evaluation, neurosurgical evaluation for the thoracic disc, and cardiology opinion for etiology of syncope. Tr. at 313–14.

State-agency consultant Olin Hamrick, Jr., Ph.D., completed a Psychiatric Review Technique ("PRT") on June 2, 2010. Tr. at 251–64. He found that there was insufficient evidence upon which to make a medical disposition or assess Plaintiff's functional limitations. *Id.*

On July 29, 2010, Plaintiff reported to Dr. Castellone's office that he had almost passed out, that the left side of his face was swollen, and that he was experiencing memory loss. Tr. at 357. On examination, Plaintiff exhibited a decreased range of motion

and pain in his extremities. Tr. at 358. He was referred for a carotid Doppler flow study. *Id.*

On August 3, 2010, Plaintiff consulted with Dr. Jason Highsmith, a neurosurgeon. Tr. at 331. On examination, Dr. Highsmith noted that Plaintiff was in significant pain with motion and that he was "clearly uncomfortable." *Id.* Plaintiff exhibited paraspinous tenderness throughout the craniocervical junction as well as in the neck, mid-back, and lower back. *Id.* He also had significant pain with palpation of his right hip and "actually winced[d] significantly." *Id.* Noting the findings of the thoracic MRI, Dr. Highsmith concluded that there was no focal lesion offering a surgical solution or other pathology of the thoracic spine and recommended the services of a rheumatologist. Tr. at 332.

Plaintiff returned to Dr. Castellone on August 12, 2010, and characterized his back pain as gnawing and severe. Tr. at 355. Plaintiff's memory and dizziness were noted to be better with medication. *Id.* Dr. Castellone noted that Plaintiff had "new" fibromyalgia and that his anxiety and hypertension were improving. Tr. at 356. The doctor referred Plaintiff to a rheumatologist. *Id.*

State-agency consultant Lisa Varner completed a PRT on August 25, 2010. Tr. at 266–79. She found that there was insufficient evidence upon which to make a medical disposition or assess Plaintiff's functional limitations. *Id.* She noted that a record from May 2009 showed a diagnosis of depression; however, examination showed normal orientation, affect, mood, memory, and insight and judgment. Tr. at 278.

On November 1, 2010, Plaintiff was seen by Dr. Gregory Niemer at Low Country Rheumatology. Tr. at 341. Plaintiff reported daily neck and back pain, which the

epidurals and TENS unit had not helped. *Id.* Diagnoses included fibromyalgia with multiple trigger points and degenerative disc disease of the lumbar and cervical spine. Tr. at 345, 347. Dr. Niemer recommended Plaintiff follow up with pain management for injections. Tr. at 345. Plaintiff was seen again on January 26, 2011. Tr. at 340. He had reported having trouble getting to sleep and that his pain impacted his activities of daily living ("ADLs"). *Id.* Examination demonstrated 16 out of 18 tender points. *Id.* Dr. Niemer diagnosed fibromyalgia, degenerative disc disease, and insomnia. *Id.*

Plaintiff saw Dr. Castellone for an annual examination on February 4, 2011. Tr. at 352. Dr. Castellone noted that his degenerative disc disease and fibromyalgia were worsening and that his anxiety was stable. Tr. at 354. The doctor recommended diet, exercise, and stress management. *Id.*

On February 10, 2011, Plaintiff saw Dr. Barton Sachs of the MUSC Orthopaedic Spine Surgery Center, on referral from Dr. Castellone. Tr. at 386. Plaintiff described total body pain and discomfort and numbness throughout his body in all four extremities. *Id.* He also reported dizzy spells and passing out and stated that they were the reason he stopped driving a truck over a year earlier. *Id.* On examination, Plaintiff was in no apparent distress and appeared to have a full range of motion in all four extremities. Tr. at 386–87. Dr. Sachs noted that Plaintiff's x-rays showed some advanced degenerative disc disease at C6–7 with some spurs. Tr. at 387. The x-rays did not indicate any gross encroachment of the spinal canal and Plaintiff did not have any significant areas of tenderness at C7 or gross instability on flexion or extension. *Id.* The radiologist interpreted the x-rays to show no alignment abnormalities and mild degenerative disc

disease. Tr. at 392. Dr. Sachs noted that Plaintiff moved well. Tr. at 387. The doctor's impression was that Plaintiff's primary condition was one of diffuse pain associated with dizziness and blackout spells, that the condition was primarily neurologic and not spinal, and that Plaintiff did not require surgical intervention. *Id.* He recommended that Plaintiff follow up with a neurologist. *Id.*

c.    Lay Witness Statements

Plaintiff submitted lay witness statements from his wife, his cousin, a friend, and his former boss.

Plaintiff's wife, Jane Keefer, reported that she struggled with balancing her work as a licensed practical nurse with taking care of her husband. Tr. at 184. She stated that he has kept her up several times during the night because of his inability to get relief from pain. *Id.* She reported that Plaintiff could not assist with household chores, maintain the cars, or perform household repairs. *Id.* She stated that his medication resulted in memory loss, that he was depressed and moody due to pain, and that he could no longer play with his grandchildren or sit long enough to watch television. *Id.*

Plaintiff's cousin, Donna Sykes, stated that she moved into Plaintiff's home to help him with daily activities. Tr. at 174. She stated that even walking to the mailbox could be difficult for him some days and that he had to lie down after taking a short walk. *Id.* She noted that she cooked and shopped for Plaintiff and took him to his doctor's appointments. *Id.*

Plaintiff's friend, Shawn Sandella, reported that he sometimes helped Plaintiff with his yard work, especially if it involved any lifting. Tr. at 177. He noted having seen Plaintiff in pain from trying to pick up pine cones in his yard. *Id.*

Plaintiff's former boss, Dennis Hair, reported that Plaintiff had many absences for depression and back problems during the last 10 years that Plaintiff worked for him. Tr. at 393. He stated that Plaintiff ultimately had so many absences that he had to leave his job. *Id.*

    C.      The Administrative Proceedings

          1.      The Administrative Hearing

                a.      Plaintiff's Testimony

                      i.      March 10, 2011

At the hearing on March 10, 2011, Plaintiff stated that he lived with his wife, who was employed. *Id.* He testified that a cousin moved in with them three months earlier to help care for him. Tr. at 35.

He testified that he last worked as a self-employed truck driver on August 10, 2009. Tr. at 30. He stated he was an independent driver for approximately one year and, prior to that, worked as a company driver. Tr. at 31. He testified that he was also previously employed as a boiler operator, but left that job because of back, neck, and leg problems and depression. Tr. at 32, 34. He stated that in the last several months before his alleged onset date, he turned down jobs because his back pain rendered him unable to drive. Tr. at 37. He testified that his wife went on the road with him for the last six weeks that he worked to try to help and take care of him. *Id.* He said she would tell him to pull

over if it looked like he was starting to get dizzy or was in substantial pain. *Id.* He stated that on his last driving trip, he abandoned the load half way because he could not finish the trip. Tr. at 38. Plaintiff testified that sitting in his truck became extremely painful during his last few months of work and that he could only push himself to do so for 30 minutes before having to stop. Tr. at 40.

Plaintiff testified that injections for his neck and back pain provided relief "to a degree." Tr. at 39. They made the pain bearable, but not so that he could walk more than 15 or 20 minutes. Tr. at 39–40. He stated that he was told that he had so much scar tissue that he was not a candidate for surgery. Tr. at 41.

Plaintiff testified he spent most of his time lying around the house. Tr. at 32. He stated that he tried to walk some because his doctor told him it would help alleviate his arthritis symptoms. *Id.* He said he would walk around his house, yard or occasionally "down the street a little ways," but stated that he always had to lie down to get pain relief after walking. Tr. at 32–33. He stated that his walks lasted 10 to 15 minutes. Tr. at 36. He estimated that he spent up to half his day lying on the floor. Tr. at 36. Plaintiff explained that he would lie on the floor rather than on a couch or sofa because he experienced dizzy spells and was afraid he would fall. Tr. at 37. He stated that he could sit in a regular chair for about 10 minutes. Tr. at 47. He said he could force himself to sit longer, as he stated he was doing during the hearing, but that he would "pay for it" when he returned home and would have to take muscle relaxers and lay down. *Id.*

Plaintiff testified that he did not go grocery shopping or engage in other kinds of activities outside of the home. Tr. at 33. He stated that he was unable to perform

household chores as he used to, such as cooking, cleaning, vacuuming, and doing laundry. Tr. at 44. He stated that he used to go to church all the time, but no longer went because he could not sit through the service. Tr. at 33. He said that since he stopped driving a truck, he had never left the house by himself because he was scared of passing out from pain. Tr. at 44.

He stated that he took all of his medications as recommended and that they helped alleviate some of his pain, but also caused side effects such as memory loss, insomnia, constipation, and dizziness. Tr. at 42. He said he took Lortab, which prevented him from driving, and which was illegal to take while driving commercially. Tr. at 42–43. Plaintiff stated that if he did not take his mediations, he would pass out. Tr. at 43. He said he was taking medication for depression and that he had issues with depression since his time as a boiler operator. *Id.* He testified that all of the problems that he described during the hearing were consistent with his condition as of his alleged onset date in 2009. Tr. at 47.

Plaintiff sought permission to stand-up part-way through the hearing. Tr. at 43. Although Plaintiff's attorney stated that Plaintiff's wife was available to testify, he subsequently stated that the testimony would basically be corroborative of Plaintiff's testimony and agreed to submit her statement instead. Tr. at 45–46.

ii.    September 26, 2013

Plaintiff testified that he underwent two surgical procedures since the first hearing. Tr. at 410. He stated he was fainting prior to surgery and the doctors in the emergency room informed him that he needed neck surgery. *Id.* He indicated he had two vertebrae removed from his neck and three vertebrae fused in January 2013. *Id.* He testified he also

underwent a surgical procedure to his thoracic spine on July 15, 2013, to remove two discs, fuse three discs, and insert a titanium rod in his spine. *Id.* He stated he needed additional surgical intervention. *Id.*

Plaintiff testified that he had received intermittent treatment for his back problems because he had lost insurance coverage when both he and his wife were unemployed. Tr. at 411. He stated his back problems had not improved and had continually worsened. *Id.* Plaintiff testified that he took medication for depression and anxiety. *Id.* He indicated that his pain, depression, and anxiety were overwhelming at times. Tr. at 412. He stated that he was also prescribed medication to treat fibromyalgia. *Id.*

> b.     Vocational Expert Testimony

Vocational Expert ("VE") J. Adger Brown, Jr., reviewed the record and testified at the hearing on March 10, 2011. Tr. at 48. The VE categorized Plaintiff's PRW as a boiler operator as medium, skilled work and as a tractor trailer driver as medium, semi-skilled work. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but had to avoid dangerous machinery, work hazards, and driving. Tr. at 49. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there was any other work that could accommodate those limitations. *Id.* The VE identified the jobs of quality control examiner, product sampler and weigher, and parts packer. Tr. at 49–50. The VE stated that these jobs would afford a sit/stand option so long as the hypothetical individual did not change position more frequently than every 30 to 45 minutes. Tr. at 50. Upon

questioning by Plaintiff's counsel, the VE stated that the inability to focus and maintain concentration at least 20 percent of the time would preclude work. Tr. at 51–52.

### 2.    The ALJ's Findings

In his decision dated November 7, 2013, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.
2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 10, 2009 through his date last insured of September 30, 2009 (20 CFR 404.1571 *et seq.*).
3.  Through the date last insured, the claimant had the following medically determinable impairments: depression and anxiety. (20 CFR 404.1521 *et seq.*).
4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).
5.  The claimant was not under a disability, as defined in the Social Security Act, at any time from August 10, 2009, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(c)).

Tr. at 401–05.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ disregarded all evidence after the DLI;

2)  the ALJ erroneously determined he had no severe impairments;

3)  the ALJ did not assess an RFC that reflected all of his established limitations;

4)  the ALJ did not adequately assess his credibility; and

5)  the ALJ failed to apply the Regulations correctly in light of his limitation to sedentary work.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

---

meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–

58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483

F.2d 773, 775 (4th Cir. 1972).

       B.     Analysis

          1.     Evidence After Plaintiff's DLI

Plaintiff argues that the ALJ erroneously disregarded all evidence dated after his

DLI, including medical records and statements from lay witnesses. [ECF No. 15 at 14–

21]. Plaintiff contends that the Fourth Circuit's decision in *Bird v. Comm'r of Soc. Sec.*,

699 F.3d 337 (4th Cir. 2012), requires that later evidence be considered unless the record

clearly shows that it is unrelated to the period prior to the DLI. [ECF No. 18 at 1–2].

The Commissioner maintains that there was no evidence in the record to suggest

that Plaintiff's symptoms and impairments had persisted since the period prior to his DLI

or had significantly worsened immediately after his DLI. [ECF No. 17 at 15].

"Medical evaluations made after a claimant's insured status has expired are not

automatically barred from consideration and may be relevant to prove a disability arising

before the claimant's DLI." *Bird*, 699 F.3d at 340, *citing Wooldridge v. Bowen*, 816 F.2d

157, 160 (4th Cir. 1987). "[P]ost-DLI medical evidence generally is admissible in an SSA

disability determination in such instances in which that evidence permits an inference of

linkage with the claimant's pre-DLI condition." *Id.*, *citing Moore v. Finch*, 418 F.2d

1224, 1226 (4th Cir. 1969). Furthermore, "retrospective consideration of medical

evidence is especially appropriate when corroborated by lay evidence." *Id.* at 342, *citing*

*Moore*, 418 F.2d at 1226. In *Bird*, the court explaine that under its decisions in *Moore*

and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005), "retrospective consideration of

evidence is appropriate when 'the record is not so persuasive as to rule out any linkage'

of the final condition of the claimant with his earlier symptoms." *Id.* at 341, *citing Moore*,

418 F.2d at 1226.

The ALJ indicated the following regarding evidence of degenerative disc disease,

dizziness, and fibromyalgia prior to Plaintiff's DLI:

> While the claimant has alleged that his degenerative disc disease, fibromyalgia, and dizziness were severe impairments, these conditions were not medically determinable impairments prior to the date last insured. To be a medically determinable impairment, an impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by a claimant's statement of symptoms. 20 C.F.R. § 404.1508. An individual's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. § [404.]1528. Regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings. No symptom or combination of symptoms by itself can constitute a medically determinable impairment. Social Security Ruling 96-4p.

> While I concede that evidence following this period is consistent with a finding that these are severe impairments, there is no documentation of any objective findings or other medical evidence consistent with these alleged impairments during the relevant period. There is no documentation of any medical treatment during the relevant period related to degenerative disc disease, fibromyalgia, or dizziness. The physical exam chronologically closest to the relevant period, which occurred in May 2009, noted normal musculoskeletal examination and gait (Exhibit 2F). Therefore, I do not assess these conditions to be medically determinable impairments prior to the date last insured.

Tr. at 401–02.

The ALJ further indicated "I have given limited weight to the claimant's medical records following his date last insured of September 30, 2009, as they are less relevant to the claimant's claim for disability the more chronologically distant they are from the claimant's date last insured." Tr. at 403. He also stated "[i]n terms of the claimant's degenerative disc disease, dizziness, and fibromyalgia, the record does not support existence of these conditions as of the date last insured." *Id.* He explained "[t]he record documents that the claimant had not complained of neck/back pain or dizziness in the months leading up to his onset date, nor had he undergone any treatment related to these conditions." *Id.*

The ALJ wrote he "considered the opinions of Donna Sykes, Shawn Sandella, Jane Keefer, and Dennis Hair," but accorded them "minimal weight." Tr. at 404. He wrote that Ms. Sykes, Mr. Sandella, and Mrs. Keefer failed to address "the relevant period in 2009." *Id.* As for Mr. Hair's statement, the ALJ indicated that "his observations were based on his observations of the claimant's job performance while working for him in 2000, which is chronologically distant from the period relevant to this decision." *Id.*

The undersigned finds that the ALJ did not properly consider evidence after Plaintiff's DLI in accordance with Fourth Circuit precedent. The ALJ relied on 20 C.F.R. §§ 404.1508 and 404.1528 and SSR 96-4p, which require signs, symptoms, or laboratory findings demonstrating the existence of an impairment. He interpreted the law to require such proof prior to Plaintiff's DLI and based his conclusion that Plaintiff did not have degenerative disc disease, dizziness, or fibromyalgia before his DLI on the fact that there were no signs, symptoms, or laboratory findings to support these impairments in the

record at that time. *See* Tr. at 401. However, this appears to be an improper interpretation of the law in light of the Fourth Circuit's decision in *Bird*, which directs that the ALJ look to the entire record and consider the post-DLI evidence unless the entire record rules out any possibility of linkage between the post-DLI evidence and the pre-DLI symptoms.

In this case, signs, symptoms, and laboratory findings corroborating Plaintiff's complaints exist in the record after the DLI. Although the ALJ indicated that the physical examination in May 2009 was chronologically closest to the relevant period, the physical examination that was actually chronologically closest to the relevant period was that performed on November 13, 2009, when Dr. Castellone observed paresthesias and weakness in Plaintiff's legs and prescribed Lortab for pain. *See* Tr. at 368. This was slightly more than six weeks after Plaintiff's DLI, whereas the examination on May 5, 2009, occurred nearly five months before Plaintiff's DLI and during the period in which he was still working. *See* Tr. at 218–20. Furthermore, the record for the year-and-a-half following Plaintiff's DLI is replete with evidence of signs, symptoms, and diagnostic test findings supporting the existence of degenerative disc disease, disc protrusions, spinal stenosis, nerve root irritation, fibromyalgia, and dizziness. On November 19, 2009, an MRI of Plaintiff's lumbar spine revealed mild degenerative facet arthropathy at L5–S1without compromise of the exiting L5 nerve root. Tr. at 222. A nerve conduction study on November 24, 2009, indicated signs of acute nerve root irritation at S1 bilaterally, and Dr. Hoover indicated that Plaintiff's muscles showed moderately increased spontaneous activity. Tr. at 365. An MRI of Plaintiff's cervical spine on December 31, 2009, revealed mostly mild diffuse spondylosis and a disc osteophyte complex at C6–7 that extended

intraforaminally on both sides and could contact the exiting nerve roots at C7, as well as a focal central superior and inferior extrusion, causing moderate central stenosis and mild anterior cord flattening. Tr. at 307. On January 6, 2010, Plaintiff exhibited tenderness in the area of the SI joint on the right, tenderness over the sacrum midline, and pain upon flexion and extension of the lumbar spine. Tr. at 233. Dr. Phillips noted that his leg pain had improved, but that it had previously prevented him from walking. *Id.* On January 28, 2010, Dr. Phillips observed thoracic and lumbar paraspinal tenderness and recommended a spinal cord stimulator. Tr. at 243–44. On April 8, 2010, an examination by Dr. Plyler revealed decreased but symmetric reflexes, patchy sensory spots distally, and some spasm in the neck and lumbar muscles. Tr. at 317. An MRI of Plaintiff's thoracic spine showed left central disk protrusion at T9–T10 that effaced the left ventral aspect of the thoracic cord. Tr. at 316. On July 29, 2010, Dr. Castellone observed Plaintiff to demonstrate decreased range of motion and pain in his extremities. Tr. at 358. On August 3, 2010, Dr. Highsmith observed Plaintiff to have paraspinous tenderness throughout the craniocervical junction and in the neck, mid-back, and lower back and to be in significant pain with palpation of his right hip and with motion. Tr. at 331. On November 1, 2010, Dr. Niemer observed multiple trigger points and diagnosed Plaintiff with fibromyalgia. Tr. at 341. On January 26, 2011, Dr. Niemer noted that Plaintiff had 16 of a possible 18 trigger points indicative of fibromyalgia. Tr. at 340. On February 10, 2011, Dr. Sachs indicated that Plaintiff's dizzy spells and passing out were likely neurological in origin and related to his pain. Tr. at 386.

Furthermore, the ALJ ignored evidence in the record that suggested Plaintiff's back pain and dizziness began prior to his DLI. The ALJ failed to address specific medical records after Plaintiff's DLI that indicated his impairments began prior to his DLI. On November 13, 2009, approximately six weeks after his DLI, Plaintiff informed Dr. Castellone that his back ache and back pain began months earlier. Tr. at 368. Plaintiff again informed Dr. Castellone on December 1, 2009, that his back pain had begun months earlier. Tr. at 359. On December 3, 2009, Plaintiff reported to Dr. Phillips that his lower back pain had begun years earlier. Tr. at 225. On April 27, 2010, Plaintiff reported to Dr. Plyler that he had experienced syncopal and blackout events for about five years. Tr. at 313. On February 10, 2011, a little over 16 months after his DLI, Plaintiff reported to Dr. Sachs that he stopped driving a truck over a year earlier because of passing out and dizzy spells. Tr. at 386. In addition, the ALJ ignored the Fourth Circuit's directive in *Bird* regarding lay evidence. *See* 699 F.3d at 342. While the ALJ determined that Mr. Hair's statement was entitled to minimal weight because it was chronologically distant from the period relevant to this decision, he neglected to address the fact that Mr. Hair's statement corroborated indications Plaintiff made to his physicians that back pain and depression were longstanding problems and suggested that the impairments were severe enough to interfere with his ability meet workplace attendance requirements. Tr. at 393.

In light of objective evidence supporting diagnoses of degenerative disc disease, disc protrusions, spinal stenosis, nerve root irritation, fibromyalgia, and dizziness, as well as significant evidence in the record to support possible linkage between the post-DLI

evidence and the pre-DLI symptoms, the undersigned finds that the ALJ erroneously discounted evidence after Plaintiff's DLI.

2.    Severe Impairments

Plaintiff argues that the ALJ erred in determining that he had no severe impairments prior to his DLI. [ECF No. 15 at 22]. The Commissioner argues that the evidence after Plaintiff's DLI supports the ALJ's finding that Plaintiff did not have an impairment or combination of impairments that were severe prior to his DLI. [ECF No. 17 at 20].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Determination of severity of claimant's impairment is "[a] de minimis hurdle in [the] disability determination process," meant to expedite just settlement of claims by "screening out totally groundless claims." *Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008).

The ALJ determined that Plaintiff "did not have an impairment or combination of impairments that significantly limited the ability to perform basic work related activities for 12 consecutive months" and "did not have a severe impairment or combination of impairments." Tr. at 402. The ALJ concluded that Plaintiff did not have degenerative disc disease, dizziness, and fibromyalgia prior to his DLI. Tr. at 404. He also determined that depression and anxiety were nonsevere impairments because they "caused no more than

'mild' limitation" in ADLs, social functioning, and concentration, persistence, or pace and because Plaintiff had no episodes of decompensation. Tr. at 405.

In light of the ALJ's failure to properly consider evidence after Plaintiff's DLI, his conclusion that Plaintiff did not have degenerative disc disease, dizziness, or fibromyalgia prior to his DLI is not supported by substantial evidence. As indicated above, the ALJ concluded that Plaintiff had no severe impairments, but failed to address multiple indications in the record that suggested Plaintiff's back pain and dizziness existed prior to his DLI. In the previous decision, the undersigned wrote "[i]t would have been reasonable to find that the record evidence did not support the existence of degenerative disc disease or fibromyalgia as of the date last insured." *See* Tr. at 459. In determining that the ALJ's conclusion that Plaintiff had no severe impairments was not supported by substantial evidence, the undersigned is not now suggesting that the ALJ was required to conclude that degenerative disc disease and fibromyalgia were severe impairments prior to Plaintiff's DLI. However, based on the Fourth Circuit's decision in *Bird*, the ALJ was required to consider the evidence both before and after the DLI and to adequately explain his reasons for inferring no linkage between Plaintiff's pre-DLI condition and his post-DLI state of health. Because the ALJ failed to adequately explain his conclusion and to address the evidence that conflicted with that conclusion, the undersigned must find that his conclusion was not supported by substantial evidence.

### 3.     RFC

Plaintiff argues that the ALJ's determination that Plaintiff had no physical or mental limitations was not supported by the evidence. [ECF No. 15 at 24–25]. The

Commissioner maintains that the ALJ did not assess Plaintiff's RFC because he appropriately determined that Plaintiff did not have a severe impairment or combination of impairments under the regulations. [ECF No. 17 at 18].

"RFC is an assessment of the individual's ability to do sustained work-related physical and mental activities on a regular and continuing basis." SSR 96-8p. In determining a claimant's RFC, the ALJ should only consider functional limitations and restrictions resulting from medically-determinable impairments and should consider the individual to have no limitation or restriction to RFC if the record does not support the existence of limitations. *Id.* The RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule, describe the maximum amount of each work-related activity the individual can perform based upon the evidence in the case record, and resolve any material inconsistencies or ambiguities in the evidence. *Id.*

Because the ALJ determined that Plaintiff had no severe impairments prior to his DLI, he assessed no RFC. *See* Tr. at 401–02.

The ALJ's rationale finds support in SSR 96-8p only if his conclusion that Plaintiff had no severe impairments is supported by substantial evidence. However, because the ALJ failed to adequately address the evidence at earlier steps, the decision

not to assess an RFC is not supported by the record. Upon remand, the ALJ should consider and address the pre-DLI and post-DLI evidence, determine whether Plaintiff had a severe impairment or a combination of severe impairments prior to the DLI, and provide sufficient support for his conclusion. If the ALJ determines that Plaintiff had an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities prior to his DLI, the ALJ should assess Plaintiff's RFC in accordance with the directives of SSR 96-8p. However, if the ALJ concludes that Plaintiff had no severe impairments prior to his DLI and the ALJ's conclusion is supported by substantial evidence, SSR 96-8p does not require that he assess an RFC.

    4.      Credibility Assessment

Plaintiff argues that the ALJ neglected to evaluate his credibility in light of the entire case record. [ECF No. 15 at 27]. The Commissioner contends that the ALJ appropriately considered the medical records, Plaintiff's treatment history, Plaintiff's medications, and the statements of the lay witnesses. [ECF No. 17 at 19].

SSR 96-7p provides the following guidance to ALJs tasked with assessing the credibility of claimants' statements:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of the objective medical evidence.
>
> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and

other information provided by treating or examining physicians or psychologists about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The provisions of 20 C.F.R. § 404.1529(c) set forth the following factors that the

ALJ must consider in addition to the objective evidence when assessing a claimant's

credibility:

1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate or aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and
7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

The ALJ indicated the following with respect to Plaintiff's credibility:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably

expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

Tr. at 403.

The undersigned finds that the ALJ did not properly assess Plaintiff's credibility. It is imperative that the ALJ consider the entire record in determining a claimant's credibility. *See* SSR 96-7. However, as indicated above, the ALJ ignored pertinent evidence. The ALJ also made a conclusory statement regarding Plaintiff's credibility, finding that his statements were not entirely credible "for the reasons explained in this decision." *See* Tr. at 403. He failed to address any of the provisions set forth in 20 C.F.R. § 404.1529(c). It appears that the ALJ dispensed with the requirement to adequately assess Plaintiff's credibility by merely concluding that the medical records prior to Plaintiff's DLI did not reflect any significant complaints, but this was improper in light of the post-DLI evidence.

### 5.     Limitation to Sedentary Work

Plaintiff argues that Plaintiff was limited to sedentary work prior to his DLI and was thus disabled based on 20 C.F.R. Part 404, Subpt 2, App. 2, Sec. 200.00, and Table 1, Rule 201.06 ("Grid Rule 201.06"). [ECF No. 15 at 29]. The Commissioner argues that Plaintiff is not disabled under the medical-vocational guidelines because the ALJ did not find that he was limited to sedentary work. [ECF No. 17 at 20].

The undersigned does not find that the ALJ erred in failing to apply Grid Rule 201.06. The evidence does not overwhelmingly demonstrate that Plaintiff was limited to sedentary work prior to his DLI. However, if upon remand, the ALJ determines that

Plaintiff was limited to sedentary work prior to his DLI, Grid Rule 201.06 would be applicable.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

January 5, 2014                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge